**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LENA SHEALAYNO'SUN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.                                            ) | **Case No. 18-cv-0746 (APM)** |
| ) | |
| **RYAN D. MCCARTHY,[1] in his official capacity** ) | |
| **as Secretary of the Army,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

I.     **INTRODUCTION**

Plaintiff Lena Shealayno'sun, an engineer with the U.S. Army Corps of Engineers ("the Corps"), brings this action against Defendant Ryan D. McCarthy, in his official capacity as Secretary of the Army, asserting claims of discrimination and retaliation under the Rehabilitation Act of 1973.  Plaintiff was diagnosed with stage IV metastatic cancer in November 2015 and was subsequently granted reasonable accommodations, including full-time telework and a flexible schedule.  She alleges that Defendant (1) discriminated against her by failing to accommodate her disability and (2) retaliated against her on the basis of her disability.

This matter is presently before the court on Plaintiff's Motion for Partial Summary Judgment and Sanctions for Spoliation of Evidence, and Defendant's Cross-Motion for Summary Judgment.  Plaintiff moves for partial summary judgment on her retaliation claims only, whereas Defendant moves for summary judgment on all claims.  After thorough consideration of the

---

[1]  Ryan D. McCarthy, in his official capacity as Secretary of the Army, is substituted for Defendant Dr. Mark T. Esper under Federal Rule of Civil Procedure 25(d).

parties' arguments and the record in its entirety, the court concludes that genuine issues of material fact preclude entry of summary judgment on one of Plaintiff's retaliation claims—the lowering of her performance rating. The court, however, finds no genuine issues of material fact as to the remainder of Plaintiff's claims. Accordingly, the court denies Plaintiff's motion for partial summary judgment and grants in part and denies in part Defendant's motion for summary judgment.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Lead up to Plaintiff's Cancer Diagnosis

Plaintiff Lena Shealayno'sun has been an engineer for the U.S. government since 1987. Def.'s Mot. for Summ. J., ECF No. 34 [hereinafter Def.'s Mot.], Dep. of Lena Shealayno'sun, ECF No. 34-4 [hereinafter Pl.'s Dep. Tr.], at 13:4–6, 16:23–25. In January 2012, she started work as a "Direct Reporting Unit Engineer" for the U.S. Army Corps of Engineers' Directorate of Logistics ("DOL"). Def.'s Mot., Def.'s Stmt. of Material Facts Not in Genuine Dispute, ECF No. 34-2 [hereinafter Def.'s SoF], ¶¶ 1, 3, 11. An expert on engineering in facilities, Plaintiff is the only credentialed engineer within the DOL. *See* Pl.'s Mot. for Partial Summ. J. & Sanctions for Spoliation of Evidence, ECF No. 33 [hereinafter Pl.'s Mot.], Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot., ECF No. 33-1 [hereinafter Pl.'s Mem.], at 3; Def.'s SoF ¶ 20. Since joining the agency, Plaintiff's direct supervisor and rater has been the DOL Director, Jeffrey Burbach. *See* Def.'s SoF ¶ 21; Def.'s Mot., Dep. of Jeffrey Burbach, ECF No. 34-5 [hereinafter Burbach Dep. Tr.], at 104:19–105:04.

Between mid-June 2015 and October 31, 2015, Plaintiff was detailed to the Interagency and International Services division within the Corps. Pl.'s Dep. Tr. at 40:16–21, 48:11–13. She

2

returned to the DOL in early November 2015, *id.* at 49:20–50:1, and with her return came some very unfortunate news.  On November 6, 2015, Plaintiff was diagnosed with cancer.  *See id.* at 50:17–20.  Several days later, she learned it was stage IV metastatic cancer, which is incurable. *Id.* at 50:17–20, 58:17–23.  Due to the advanced stage of Plaintiff's cancer, she required aggressive treatment.  *Id.* at 85:21–25.  Plaintiff immediately notified Mr. Burbach's deputy, Belinda Taswell, of her cancer diagnosis, and Ms. Taswell then notified Mr. Burbach.  *See* Pl.'s Mem., Ex. 14 [hereinafter PEX 14], at 311.[2]  Plaintiff requested that Mr. Burbach keep her medical condition private.  *See* Def.'s Mem. of P. & A. in Opp'n to Pl.'s Mot. for Sanctions and in Opp'n to Pl.'s Mot. for Partial Summ. J., ECF No. 38 [hereinafter Def.'s Opp'n], Def.'s Resp. to Pl.'s Stmt. of Undisputed Material Facts, ECF No. 38-1 [Def.'s Resp. to Pl.'s SoF], ¶ 77; Burbach Dep. Tr., at 12:14–16.

## 2. *Plaintiff's Request for Reasonable Accommodations*

On November 13, 2015, Plaintiff contacted the Corps's Equal Employment Opportunity ("EEO") Specialist, Earl Newton, regarding a request for reasonable accommodations.  *See* Def.'s Resp. to Pl.'s SoF ¶ 19.  On that same day, Plaintiff says Ms. Taswell informed her that she had shared Plaintiff's cancer diagnosis with another Corps employee.  *See* Pl.'s Dep. Tr. at 55:19–56:3. As a result, one of the accommodations Plaintiff sought was reassignment to another directorate due to the unauthorized disclosure of her medical information.  *See* Pl.'s Opp'n, Ex. 10, ECF No. 37-1 [hereinafter Pl.'s Opp'n Ex. 10], at 108; Pl.'s Dep. Tr. at 55:6–11.  Following her conversation with Mr. Newton, Plaintiff says she "sensed that he had some bias [due to his personal relationship with Ms. Taswell] and also some incompetence."  Pl.'s Dep. Tr. at 54:18–21; Pl.'s Mem., Stmt. of

---

[2] Plaintiff's exhibits to her motion for partial summary judgment, noted as "PEX," are located in the same document as her memorandum in support thereof, ECF No. 33-1.  Accordingly, pincites to Plaintiff's exhibits refer to the PDF page numbers.

Undisputed Material Facts [hereinafter Pl.'s SoF], ¶ 23.[3]  As a result, Plaintiff instead turned to the Corps Command Surgeon, Commander Thomas Janisko, for assistance in filing her request for reasonable accommodations.  Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 37 [hereinafter Pl.'s Opp'n], Pl.'s Stmt. of Material Facts in Dispute [hereinafter Pl.'s Resp. to Def.'s SoF], ¶¶ 28–29.[4]

Through Commander Janisko, Plaintiff submitted two forms.  On "Form 1-2 (Medical Information Sheet)," Plaintiff's physician Dr. Tejaswi Sastry explained that Plaintiff had been diagnosed with "metastatic cancer" of unknown primary source, *see* Def.'s Mot., Ex. 1, ECF No. 34-8 [hereinafter DEX 1], at 3;[5] Pl.'s SoF ¶ 27, and that her "[p]rognosis & treatment plans [we]re pending . . . results from additional testing & consultation reports from specialists," Pl.'s Opp'n Ex. 10 at 108.  Dr. Sastry noted that Plaintiff's "diagnosis [would] render[] a significant impairment for an estimated 6-8 months while [Plaintiff] receive[d] treatment & recover[ed] from that treatment." *Id.*  On "Form 1-1 (Request for Reasonable Accommodation)," Plaintiff requested (1) "[m]edical telework and flexibility in scheduled work hours as required for medical appointments" and procedures; (2) "[a]dditional time to complete tasks for non-mission essential/non-critical job duties"; and (3) "[r]e-assignment to another . . . Directorate due to unauthorized disclosure of private medical information in violation of the Privacy Act and/or HIPAA Act, on/about 13 NOV 2015." *See* DEX 1 at 2.

---

[3] Plaintiff's Statement of Undisputed Material Facts is located within her Memorandum of Points & Authorities in Support of Motion for Partial Summary Judgment and Sanctions for Spoliation of Evidence, ECF No. 33-1, starting at page 2.

[4] Plaintiff's Statement of Material Facts in Dispute is located within her Opposition to Defendant's Motion for Summary Judgment, ECF No. 37, starting at page 3.

[5] Defendant's exhibits to his motion for summary judgment, noted as "DEX," are located within a single document at ECF No. 34-8.  Accordingly, pincites to Defendant's exhibits refer to the PDF page numbers.

As Plaintiff's supervisor, Mr. Burbach was the "approval authority" for her request for reasonable accommodation.  Def.'s SoF ¶ 31.  Because Mr. Burbach was unfamiliar with the accommodation process, however, he says he sought guidance from Mr. Newton, Commander Janisko, and others, on how to handle Plaintiff's accommodation request.  *See* Burbach Dep. Tr.at 50:14–17; Pl.'s Mem., Ex. 2, Jeffrey Burbach 30(b)(6) Dep. Tr., at 118.  In an email to Plaintiff dated November 30, 2015, Commander Janisko relayed to Plaintiff that Mr. Burbach was "completely on board" with her request for reasonable accommodation and would "support[] [her] in whatever [she] need[ed]."  Def.'s Mot., Dep. of Thomas Janisko, ECF No. 34-7 [hereinafter Janisko Dep. Tr.], at 62:9–13.  At that time, Plaintiff was placed on full-time medical telework and a flexible work schedule to attend medical appointments.  *See* Pl.'s Resp. to Def.'s SoF ¶ 48; Pl.'s Dep. Tr. at 98.

According to Mr. Newton, Mr. Burbach did not contact him about Plaintiff's request for accommodation until sometime in 2016.  *See* Def.'s Mot., Dep. of Earl Newton, ECF No. 34-6 [hereinafter Newton Dep. Tr.], at 80:2–3.  Until then, he explains, Mr. Burbach had been letting Plaintiff telework for a year as an informal grant of her accommodation request.  *Id.* at 80:18–81:7, 82:22–84:6.  Shortly after Mr. Newton instructed Mr. Burbach on the proper procedure for processing reasonable accommodation requests, Mr. Newton says Mr. Burbach inquired as to what "restrictions" he could place on Plaintiff.  *Id.* at 86:22–87:14.  Mr. Burbach said he wanted to impose a weekly report on Plaintiff and other teleworkers to get a better understanding of what they were working on.  *Id.* at 88:21–89:16.

### 3.   *Renewal of Plaintiff's Accommodations and Her EEO Complaints*

In the spring of 2016, the relationship between Plaintiff and Mr. Burbach began to sour.  Plaintiff alleges that by April 2016, Mr. Burbach was calling her monthly to ask about her health

status and when she planned on physically coming into the office.  *See* Pl.'s Dep. Tr. at 107:8–15; *see also* Pl.'s SoF ¶ 47 (citing Pl.'s Dep. Tr. at 107:10–20) ("His calls became progressively more aggressive in tone and he continuously asked for a specific date of when [Plaintiff] would return."). At the same time, Plaintiff was undergoing aggressive treatment for her cancer.  In April 2016, Plaintiff underwent surgery, and because there were complications, she was out of work for approximately two weeks.  *See* Pl.'s Dep. Tr. at 79:11–21.  She started a second round of chemotherapy in June 2016 and underwent treatment weekly, usually on Tuesdays, through the end of August 2016.  *See id.* at 80:13–81:8.

On September 23, 2016, Mr. Burbach sent Plaintiff an email in which he asked her to submit a new request for accommodations because it had been "nearly a year since the first one was signed."  DEX 14 at 39.  He stressed that the request should "include [Plaintiff's] Physician's current Diagnosis and Prognosis."  *Id.*  In the same email, Mr. Burbach informed Plaintiff that she was expected to call in to all DOL meetings, including staff meetings on Tuesdays (when Plaintiff frequently was scheduled to see her oncologist, *see* Pl.'s Dep. Tr. at 80:21–81:13), among other requirements, *see* DEX 14 at 39–40.

On October 26, 2016, Plaintiff's physician, Dr. Rebecca L. Stone, wrote a letter to the agency explaining that Plaintiff's prognosis remained "uncertain," and because her cancer was at stage IV, "there [was] a 90% risk of recurrence over the next 10 months."  DEX 3 at 8.  Dr. Stone stated that Plaintiff likely would "need even more aggressive medical treatments and/or surgery." *Id.*  "Not unexpectedly," Dr. Stone added, Plaintiff was "battling anxiety and depression," and she recommended that Plaintiff "avoid mental and physical stress, in particular a stressful work environment."  *Id.*  Dr. Stone conveyed her recommendation that Plaintiff "not return to her public workplace until medically cleared to commute to and from the office, and to work multiple hours

without relief." *Id.* "If at all possible," she added, "[Plaintiff] should be reassigned to a work environment that is most permissive to her healing." *Id.*

On November 1, 2016, Plaintiff attached Dr. Stone's letter and another from Dr. Sastry, *see* DEX 2 at 6, to an informal complaint she filed with the Corps's EEO office, *see* PEX 6 at 247. In her informal complaint, Plaintiff alleged disability discrimination arising from what she claimed was "[Mr.] Burbach's revocation of [her] reasonable accommodation." Pl.'s SoF ¶ 50; Def.'s SoF ¶ 36. On December 23, 2016, Plaintiff filed a formal EEO complaint alleging, among other things, that Mr. Burbach: "repeatedly made harassing and intimidating phone calls regarding [her] medical status and return to the workplace," "failed to implement [her] reassignment, in violation of [her] original [reasonable accommodation] request," "failed to remedy [a] Privacy Act violation by his deputy," and "failed to restore 44 hours of annual leave for the time period January 25-29, 2016." PEX 7 at 252–53; *see* Def.'s SoF ¶ 37; Pl.'s SoF ¶ 51.

Just over two weeks later, on January 11, 2017, Mr. Burbach sent Plaintiff a letter "approving the continuance of [her] Reasonable Accommodation" and providing "guidance on [her] work parameters/requirements." DEX 4 at 11. The requirements largely echoed those in Mr. Burbach's September 23, 2016 email, with a few additions, including that Plaintiff email Mr. Burbach when she closed out work at the end of each day. *Id.* at 11–12. Approximately two weeks later, Plaintiff filed a second informal complaint alleging disability discrimination arising from Mr. Burbach's January 11, 2017 letter. *See* Pl.'s SoF ¶ 56 (citing PEX 9).

### 4.   *Escalating Tension and Plaintiff's Performance Evaluation*

Just shy of two years into Plaintiff's accommodation, on October 17, 2017, Mr. Burbach sent Plaintiff a letter stating that he had "come to the conclusion that [her] current arrangement of full-time telework [was] not compatible with the successful performance of [her] job duties and

7

[was] no longer tenable." DEX 5 at 14. He explained that, "[f]or some time," he had "observed a lack of engagement with [the DOL] operation/staff and insufficient tangible work products." *Id.* He also stated that Plaintiff's "absence from the workplace ha[d] interfered with [her] ability to effectively communicate and coordinate with [her] colleagues" and, as a result, had "had a detrimental impact on the DOL mission." *Id.* Mr. Burbach instructed Plaintiff "to report to the workplace" by the end of the week. *Id.* He added that if Plaintiff was "medically incapable of doing so, [she would] need to request sick leave and provide medical documentation if [her] inability to be present continue[d] for more than three days." *Id.* When Plaintiff did not report to the office by the deadline, Mr. Burbach sent her an email demanding that she "either come into the office [that day] or put in for sick leave." DEX 13 at 36. In response, Plaintiff advised Mr. Burbach that the issue was now a "legal matter" and told him that he would be receiving a response from her attorney. *Id.*

Just under two months later, on December 14, 2017, Mr. Burbach issued Plaintiff's performance evaluation for the period of October 1, 2016, through September 30, 2017, giving her a rating of "3." *See* Pl.'s SoF ¶ 57; Burbach Dep. Tr. at 77:11–19. Whereas Plaintiff had received the highest rating of "1" since at least 2014, *see* PEX 14 at 311, a rating of "3"—the third-highest rating—represented a significant departure. Plaintiff complained about this rating to Mr. Burbach and her second-line supervisor on the grounds that it was "significantly downgraded [from years prior] and not representative of [her] work." Pl.'s Dep. Tr. at 36:14–15. Eventually, Mr. Burbach changed the rating to a "2." *See id.* at 37:22–38:2; Burbach Dep. Tr. at 77:11–16.

The tension between Mr. Burbach and Plaintiff continued to grow from there. On February 14, 2018, Mr. Burbach again requested that Plaintiff provide her updated "diagnosis and prognosis, to include information about how Plaintiff's disability could impact her ability to complete the

essential functions of her position." DEX 7 at 20. "In conjunction with the Prognosis," Mr. Burbach told Plaintiff, he "need[ed] to better understand the expected duration [she] w[ould] need to telework from home." *Id.* Plaintiff responded with a letter from Dr. Sastry, which explained that Plaintiff's cancer would not be going away and that "[h]er treatment w[ould] always be ongoing." DEX 9 at 26. Plaintiff told Mr. Burbach that her "doctors [were] confounded as to why there [were] repeated requests for updates to [her] medical condition, for the same qualifying disability." DEX 7 at 19. She noted that "this [was] the third request for the same information." *Id.*

In March 2019, Mr. Burbach sent Plaintiff another letter, "address[ing] issues with [her] job performance which, based on [his] observations, ha[d] been caused or exacerbated by [her] absence from the worksite and [her] irregular schedule." DEX 6 at 16. He again asked Plaintiff "to obtain up[-]to[-]date documentation from [her] medical provider" that covered, among other things, the "nature and severity of [her] impairments" and the activities "limited by [her] impairments." *Id.* This time, Dr. Sastry wrote directly to Mr. Burbach, directed him to her February 2018 letter, and said that if Mr. Burbach needed more specific information he would need to obtain a signed release from Plaintiff. *See* DEX 10 at 28.

In the intervening time, Plaintiff filed this lawsuit on April 3, 2018, asserting one count each of discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C §§ 791 *et seq*. *See* Compl., ECF No. 1. On July 3, 2019, when Mr. Burbach still had not received updated medical information from Plaintiff, he sent her another letter, setting a deadline of July 19, 2019, by which she was to provide the requested information or face potential "cancellation of [her] telework privileges." DEX 11 at 30–31. On July 15, 2019, Dr. Sastry sent a letter to the Corps in which she provided a detailed explanation of Plaintiff's diagnosis, her prognosis (which

she said was "ongoing"), and the "serious physical impairments and major life limiting activities"
that Plaintiff faces.  DEX 12 at 33.  She also certified that the reasonable accommodations already
granted to Plaintiff were "necessary to allow her to continue to operate successfully in her
position."  *Id.* at 32.

### B.   Procedural Background

Following initial discovery, Plaintiff moved for leave to amend her Complaint to add and
correct factual material and to alter the relief sought.  *See* Pl.'s Consent Mot. for Leave to Amend
Compl., ECF No. 23, at 1.  The court granted Plaintiff leave to amend, *see* Minute Order, July 22,
2019, and on August 5, 2019, Defendant answered Plaintiff's Amended Complaint, *see* Answer,
ECF No. 25.  Discovery concluded on December 31, 2019, *see* Order, ECF No. 30, and on April
17, 2020, the parties filed cross-motions for summary judgment, *see* Pl.'s Mot.; Def.'s Mot.

Plaintiff asks the court to enter judgment in her favor on Count II of her Amended
Complaint, arguing that she has proffered sufficient evidence to show that Defendant unlawfully
retaliated against her when he "disclosed her medical information, revoked and restricted her
reasonable accommodation, lowered her performance rating, and refused to credit her . . . leave."
Pl.'s Mem. at 1, 28.  She also moves the court for sanctions in the form of "adverse inferences,
both in the summary judgment decision and at trial," as well as "attorneys' fees and costs related
to [her] discovery dispute and motion for sanctions," on the grounds that Defendant committed
various discovery-related infractions.  *Id.* at 19.

Defendant opposes Plaintiff's motion for sanctions and cross-moves for summary
judgment on both counts of the Amended Complaint, contending that "there is no genuine issue
of material fact relative to" any of Plaintiff's claims.  Def.'s Mem. at 4.  Briefing on the cross-
motions for summary judgment concluded on May 29, 2020, and they are now ripe for review.

*See* Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Sanctions & Partial Summ J., ECF No. 40 [hereinafter Pl.'s Reply]; Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 41 [hereinafter Def.'s Reply].

## III.   LEGAL STANDARDS

### A.   Discovery Sanctions

"A district court may order sanctions . . . for misconduct either pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes a court to assess a sanction for violation of a discovery order, or pursuant to the court's inherent power to protect its integrity and prevent abuses of the judicial process." *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (cleaned up).   Rule 37(b)(2) provides in relevant part that, if a party "fails to obey an order to provide or permit discovery," the court "may issue further just orders," including, but not limited to, an order directing that "designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A).   And pursuant to the court's inherent power, it "'may impose issue-related sanctions,' such as an adverse inference instruction, 'whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of [an] issue.'"  *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (quoting *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995)); *see also Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013) ("This court has recognized that a negative inference may be justified where the defendant has destroyed potentially relevant evidence.").

"When selecting the appropriate sanction, the Court must properly calibrate the scales to ensure that the gravity of an inherent power sanction corresponds to the misconduct." *Davis v. D.C. Child & Family Servs. Agency*, 304 F.R.D. 51, 60 (D.D.C. 2014) (internal quotation marks

omitted).  "[T]he choice of an appropriate sanction is necessarily a highly fact-based determination based on the course of the discovery process leading up to the sanction . . . ."  *Bonds v. District of Columbia*, 93 F.3d 801, 804 (D.C. Cir. 1996).  A court's use of its power to sanction misconduct "should reflect our judicial system's strong presumption in favor of adjudications on the merits."  *Shepherd*, 62 F.3d at 1475.

### B.  Summary Judgment

On a motion for summary judgment, the court's "threshold inquiry [is] determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see* Fed. R. Civ. P. 56(a).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c)(1).  In assessing whether a genuine issue of material fact exists, the court must view the evidence "in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A fact is only material if it could establish an element of a claim or defense and therefore "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248. Likewise, a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "Where—as here—the parties file cross-

12

motions for summary judgment, each must carry its own burden under the applicable legal standard." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 265 (D.D.C. 2015) (cleaned up). "The moving party is entitled to summary judgment when the nonmoving party fails to offer evidence sufficient to establish an essential element of a claim on which it will bear the burden of proof at trial." *Porter v. Sebelius*, 192 F. Supp. 3d 8, 12 (D.D.C. 2016) (citing *Celotex*, 477 U.S. at 322).

### C.      The Rehabilitation Act

The Rehabilitation Act of 1973 provides in relevant part that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). Although the Act does not specifically delineate the particular types of discrimination the statute prohibits, it provides that the applicable legal standards "shall be the standards applied under" the analogous discrimination provisions of the Americans with Disabilities Act ("ADA"). *See id.* § 794(d); *see also Schmidt v. Solis*, 891 F. Supp. 2d 72, 86–87 (D.D.C. 2012) (noting that, under the Rehabilitation Act, "substantive rights are defined by reference to the ADA, as well as the [EEOC's] regulations and enforcement guidance that implement the ADA").

Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

13

The ADA's anti-retaliation provision forbids "discrimina[tion] against any individual because such individual has . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a); *see also Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014) (holding that "the act of requesting in good faith a reasonable accommodation is protected activity" for purposes of retaliation claims brought under the Rehabilitation Act). The D.C. Circuit has held that the framework for analyzing anti-retaliation suits under the ADA and Rehabilitation Act mirrors that applied in retaliation suits under Title VII of the Civil Rights Act. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) ("Although the [retaliation] framework was developed for Title VII cases, our sister circuits have all accepted its application to ADA retaliation suits under § 12203(a), as we do now.").

## IV.  DISCUSSION

Because Plaintiff asks the court to apply adverse evidentiary inferences in evaluating summary judgment, the court starts its discussion with Plaintiff's motion for sanctions before turning to the parties' cross-motions for summary judgment.

### A.  Motion for Sanctions

#### 1.  *Spoliation of Evidence*

Plaintiff first argues that Defendant "engaged in sanctionable conduct by failing to place a litigation hold on relevant witnesses' email accounts"—specifically, that of EEO Specialist Earl Newton—"which led to the destruction of relevant documents." Pl.'s Mem. at 19. Once a party anticipates that it will be subject to litigation, the party has a duty to preserve any evidence that may be potentially relevant. *Shepherd*, 62 F.3d at 1481 (noting that a party has "an obligation to preserve and also to not alter documents it knew or reasonably should have known were relevant . . . if it knew the destruction or alteration of those documents would prejudice [its opponent]"

14

(internal quotation marks omitted)); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.").  "A party that fails to preserve evidence runs the risk of being justly accused of spoliation—defined as the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation—and find itself the subject of sanctions." *Zhi Chen*, 839 F. Supp. 2d at 12 (internal quotation marks omitted).

An issue-related sanction, such as the adverse inferences Plaintiff seeks in this case, is warranted if:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

*Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (internal quotation marks omitted).

Plaintiff has produced evidence in the form of deposition testimony of the Corps's IT technician, Leonard S. Day, stating that Defendant failed to place a litigation hold on the emails of Earl Newton, the EEO Specialist involved in the processing of Plaintiff's reasonable accommodation request, prior to Mr. Newton's retirement on April 30, 2019.  *See* PEX 26 at 374–75; Pl.'s SoF ¶ 84.  As a result, Mr. Newton's emails were deleted 45 days after his retirement in accordance with standard procedure at the time.  PEX 26 at 374.  Because Mr. Newton's retirement came over a year after Plaintiff initiated this lawsuit, Plaintiff contends, there can be no doubt that

15

Defendant reasonably "anticipate[d] litigation," nor that Defendant understood the "central role" of Mr. Newton in the lawsuit.  Pl.'s Mem. at 20.  Accordingly, Plaintiff argues that "Defendant recklessly disregarded [his] clear duty to preserve Newton's emails, therefore qualifying as bad faith destruction of relevant evidence . . . warranting sanctions."  *Id.* at 21; *see also Mazloum*, 530 F. Supp. 2d at 293 (holding gross negligence can constitute culpable state of mind).

But Plaintiff's argument falters on the third element of relevance.  As the D.C. Circuit has recognized, determining the relevance of destroyed evidence is "unavoidably imperfect" because "in [its] absence . . . a court can only venture guesses . . . as to what that missing evidence may have revealed.'"  *Gerlich*, 711 F.3d at 171 (cleaned up).  In such circumstances, "the burden on the party seeking the adverse inference is lower; the trier of fact may draw such an inference based even on a very slight showing that the documents are relevant."  *Ritchie v. United States*, 451 F.3d 1019, 1025 (9th Cir. 2006) (quoted approvingly in *Gerlich*, 711 F.3d at 172).  Here, however, Plaintiff has not provided a shred of evidence that the deleted emails were relevant.  Instead, all evidence points to the contrary.

To begin, Mr. Day testified that notwithstanding the destruction of Mr. Newton's electronic mailbox 45 days after his retirement, all of Mr. Newton's emails through about November 2018 were preserved in the Corps's "Enterprise Vault."  PEX 26 at 373–74.  Recall, Plaintiff filed this action seven months earlier in April 2018.  According to the declaration of agency counsel Catharine Debelle, Mr. Day conducted a search of these archived emails using the search terms supplied by Plaintiff, which generated approximately 11.3 GB of data.  *See* Decl. of Catharine Debelle, ECF No. 38-2 [hereinafter Debelle Decl.], ¶ 13.  "All relevant and discoverable emails [from that] search," Ms. Debelle says, "were disclosed to Plaintiff."  *Id.* ¶ 14.  Thus, for Plaintiff's claim of spoliation to succeed, she must show that "a reasonable factfinder could conclude that"

Mr. Newton's emails after November 2018 "would have supported [her] claims." *Mazloum*, 530 F. Supp. 2d at 291 (internal quotation marks omitted). She has not done so.

There is no evidence in the record to suggest that Mr. Newtown was involved with Plaintiff's EEO activities after she filed a formal complaint in December 2016. In fact, Mr. Newton testified that he would have been prohibited from interacting with an employee he had assisted with a reasonable accommodation after that point, until the conclusion of the investigation into her complaint, given the conflict of interest it posed. *See* Newton Dep. Tr. at 72:22–73:11; 127:2–7. Plaintiff offers no evidence to contradict Newton's testimony, and her own undisputed statement of material facts places Newton's last relevant acts as occurring in November 2016, two years earlier than his last preserved emails. *See* Pl.'s SoF ¶¶ 33–34, 79. Accordingly, the court agrees with Defendant that "there is no reason to believe that any emails Mr. Newton sent or received *after November 2018* (a full seven months after Plaintiff filed this action) would be relevant to Plaintiff's claims," Def.'s Opp'n at 11, and therefore declines to sanction Defendant for spoliation of evidence.

### 2.     *Violation of Discovery Order*

Plaintiff next argues that Defendant should be sanctioned for violating the court's October 21, 2019 "Discovery Order," because "Defendant did not in good faith follow the Court's order to conduct a search to identify emails not previously produced, produce evidence of comparators[,] or produce a witness to testify about how Defendant searched for records." Pl.'s Mem. at 24. This argument is flawed for several reasons.

The first and most obvious problem is that "[a] production order is generally needed to trigger Rule 37(b)," *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 951 n.129 (D.C. Cir. 1982), and the order that Plaintiff relies on for her sanctions argument hardly qualifies as such.

The order at issue was an administrative Minute Order authorizing the extension of the discovery deadline.  *See* Minute Order, Oct. 21, 2019.

Second, even if the guidance provided by the court at the October 21, 2019 status conference could reasonably be construed as "an order to provide or permit discovery," there is every indication that Defendant complied with that guidance.   According to Ms. Debelle, "[f]ollowing the October 21, 2019 discovery status conference, Defendant conducted searches for emails and documents utilizing the search terms and dates agreed to after discussions with Plaintiff's counsel."  Debelle Decl. ¶ 24.  Together, Ms. Debelle's declaration and Mr. Day's testimony detail the steps the agency took to search for and produce all relevant emails and files from the identified custodians' accounts.  *See* Debelle Decl. ¶¶ 3–11, 13–28; Def.'s Opp'n, Dep. of Leonard S. Day, ECF No. 38-3, at 10:21–13:10.  Plaintiff takes issue with Defendant's decision to allow custodians to search their own emails and documents for relevant responsive documents, *see* Pl.'s Mem. at 23, but provides no authority, and the court is not aware of any, proscribing such a practice.

Third and finally, Plaintiff contends that Defendant's search and subsequent production of documents was unduly delayed, arriving the evening prior to Mr. Day's deposition, *see id.* at 24, but as Defendant points out, "the Court did not set a time for Defendant to conduct a search other than setting the discovery deadline of November 21, 2019," Def.'s Opp'n at 18.  And according to Defendant, "Plaintiff did not provide its proposed search criteria and terms to Defendant until . . . 8 days after the teleconference."  *Id*.  Regarding Mr. Day's deposition, Defendant explains that "[b]ecause the parties had previously agreed to conduct Mr. Day's deposition on November 15, [in light of the timing of the production] Defendant's counsel offered to postpone the deposition to make Mr. Day available at another time convenient to Plaintiff and Plaintiff's counsel."  *Id*. at

19 (citing DEX 7).  It was thus Plaintiff's choice to proceed with Mr. Day's deposition shortly after receiving the documents.  *Id.*  And, in any event, Plaintiff has not shown how she was actually prejudiced by disclosure on the eve of Mr. Day's deposition.

As Plaintiff has not shown that Defendant "fail[ed] to obey an order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A), the court declines to sanction Defendant for any alleged violation.

**B.     Motions for Summary Judgment**

The court turns now to the merits.  As stated, Plaintiff's Amended Complaint consists of two counts:  (1) failure to accommodate, *see* Am. Compl. ¶¶ 105–115, and (2) retaliation, *see* Am. Compl. ¶¶ 116–123.  Defendant moves for summary judgment on both counts, while Plaintiff moves for summary judgment on Count II only.  The court considers each count in turn.

*1.     Count I – Failure to Accommodate*

To make out a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show "(1) that [s]he was an individual with a disability within the meaning of the statute; (2) that the employer had notice of h[er] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).  The plaintiff bears the burden of proving each element by a preponderance of the evidence.  *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

The parties agree that the first three factors are satisfied in this case.  *See* Def.'s Mem. at 10–11; Pl.'s Opp'n at 29–30.  They part ways, however, on the fourth factor.  Defendant maintains that "there is no genuine issue of material fact that the Corps has accommodated Plaintiff

19

since November 2015, did so at all times since[,] and continues to do so today."  Def.'s Mem. at 9.   Plaintiff disagrees, alleging that although the agency provided her with reasonable accommodations for nearly one year, *see* Am. Compl. ¶ 109, in "October 2017, the Agency, through Mr. Burbach, . . . revoked the reasonable accommodations it had awarded to Plaintiff," *id.* ¶ 111.  Specifically, Plaintiff alleges that "the Agency revoked Plaintiff['s] [] full-time medical telework and flexible schedule accommodations, demanding that she physically return to work and that her attendance at any doctor's appointments must occur through a leave request."  *Id.* ¶ 112. After this revocation, Plaintiff alleges, the Agency "failed to provide any other reasonable accommodations to Plaintiff [] or even to engage in the interactive process."  *Id.* ¶ 114.

In opposing Defendant's motion for summary judgment, Plaintiff takes her claim a step further.  She maintains that Defendant also refused to accommodate her when Mr. Burbach denied "her request for reassignment [in her initial request for accommodation] without justification," Pl.'s Opp'n at 31, and when he "interfered with her accommodation by demanding that [Plaintiff] physically return to the office and repeatedly request[ed] unnecessary recertifications from her physicians for a permanent disability," *id.* at 33.  But Plaintiff did not plead these claims in her Amended Complaint.  Aside from requesting reassignment as a form of relief sought, *see* Am. Compl. ¶ 124b, the Amended Complaint makes no mention of Defendant's refusal to reassign her as denial of a reasonable accommodation.  Nor does it mention Defendant's "interference" with Plaintiff's reasonable accommodations, which is a separate cause of action under the Rehabilitation Act.  *See Menoken v. Dhillon*, 975 F.3d 1, 9 (D.C. Cir. 2020) (holding that a claim of interference under the Rehabilitation Act is a cognizable claim separate and distinct from a claim of retaliation or failure to accommodate).  Thus, because the court must "read [Plaintiff's] complaint as [s]he wrote it," the court declines to address these additional claims that are not

20

properly before the court.  *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1371 (D.C. Cir. 2008); *see Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that claims raised for the first time in an opposition to a motion for summary judgment are not properly before the court); *Sharp v. Rosa Mexicano*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (finding that plaintiff may not, "through summary judgment briefs, raise [ ] new claims"); *accord Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Fisher v. Metro. Life Ins.*, 895 F.2d 1073, 1078 (5th Cir. 1990); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 107 (D.D.C. 2004).

The primary question before the court, then, is whether Plaintiff has presented sufficient evidence to create a triable issue of fact as to whether Mr. Burbach's October 17, 2017 letter revoked Plaintiff's "full-time medical telework and flexible schedule accommodations," as Plaintiff alleges.  *See* Am. Compl. ¶¶ 81, 112.  She has not.

Despite the rather curt language in Mr. Burbach's October 17, 2017 letter, the record testimony reflects that Plaintiff has never stopped teleworking full time and has always kept a flexible schedule since she was granted accommodations in November 2015.  *See* Pl.'s Dep. Tr. at 98:9–99:7; Def.'s Mot., Decl. of Jeffery Burbach, ECF No. 34-3 [hereinafter Burbach Decl.], ¶ 33.  Nor was Plaintiff reprimanded for not reporting to the office as ordered in Mr. Burbach's letter.  *See* Burbach Decl. ¶¶ 29, 33; Pl.'s Dep. Tr. at 153:2–22.  Although Plaintiff's testimony that Mr. Burbach has at times made Plaintiff feel compelled to take sick leave for medical appointments is disconcerting in light of her accommodations, *see* Pl.'s Dep. Tr. at 103:1–18; Am. Compl. ¶ 88, those facts do not establish that Plaintiff was prohibited from teleworking or working a flexible schedule.  Thus, even viewing the facts in the light most favorable to Plaintiff, as the court must, there is no genuine issue of material fact as to whether Mr. Burbach's October

17, 2017 letter revoked Plaintiff's reasonable accommodations.  It did not.  Accordingly, the court

grants Defendant's Motion for Summary Judgment on Count I.

>           2.      *Count II – Retaliation*

The court turns now to the cross-motions for summary judgment on Plaintiff's retaliation

claims.  As a threshold matter, the court must resolve disagreement among the parties as to what

acts Plaintiff claims were retaliatory.  In Count II of her Amended Complaint, Plaintiff alleged that

Defendant unlawfully retaliated against her in violation of the Rehabilitation Act by, "among other

things, continuing to discriminate against her with regard to her disabilities, denying her reasonable

accommodations, giving her a negative performance review, and denying her cash awards."

Am. Compl. ¶ 122.  Plaintiff frames her retaliation claim slightly differently in her motion for

partial summary judgment, however, asserting that she "suffered adverse actions when []

Defendant disclosed her medical information, revoked and restricted her reasonable

accommodation, lowered her performance rating, and refused to credit her sick leave."  Pl.'s Mem.

at 28.  Defendant notes this discrepancy and avers that Plaintiff's motion "does not include denial

of cash awards" as a retaliatory act.  *See* Def.'s Opp'n at 23.  Because the "denial of cash awards,"

however, is intrinsically linked to Plaintiff's lowered performance rating, *see* Burbach Decl. ¶ 21

("[A] performance cash award is meant to reward employees who meet or exceed their

performance standards . . . ."); *see also Russell v. Principi*, 257 F.3d 815, 818–19 (D.C. Cir. 2001)

(finding that Plaintiff had shown an adverse action where bonus size was "directly tied to her

performance rating"), the court sees no reason to consider the two acts separately.  Given Plaintiff's

framing of her retaliation claim in her motion for partial summary judgment, and considering the

facts alleged in the Amended Complaint, the court construes Plaintiff's claim of retaliation to

include the following alleged adverse actions:  (1) revocation of reasonable accommodations, *see*

Am. Compl. ¶¶ 56–88; (2) lowering of Plaintiff's performance rating, *see id.* ¶¶ 89–93; (3) disclosure of Plaintiff's medical information, *see id.* ¶¶ 40–42, 102; and (4) refusal to credit Plaintiff back annual leave erroneously deducted, *see id.* ¶¶ 94–100.

In Rehabilitation Act cases such as this one, where there is no direct evidence of discrimination or retaliation, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Solomon*, 763 F.3d at 14. At step one, "it is the Plaintiff's burden to establish a prima facie case of discrimination by a preponderance of the evidence." *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002). To do so, a Plaintiff is required to show: (1) that she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse action by her employer"; and (3) "that a [but-for] causal link connects the two." *Solomon*, 763 F.3d at 14 (cleaned up); *see also Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–68 (2006) (articulating standard in retaliation cases); *Gard v. U.S. Dep't of Educ.*, 752 F. Supp. 2d 30, 35–36 (D.D.C. 2010) (noting that, to survive motion for summary judgment on Rehabilitation Act retaliation claim, plaintiff "must present facts from which a reasonable jury could conclude that 'but for' his [prior protected activity], Defendants would not have made it more difficult to obtain a reasonable accommodation"). Plaintiff's burden is not great: she "need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

If Plaintiff succeeds, step two mandates that Defendant articulate a "legitimate, nondiscriminatory reason for its actions." *Solomon*, 763 F.3d at 14 (cleaned up). "If [Defendant] does so, the burden-shifting framework disappears." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (cleaned up). At that point, "a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence, which includes not only the prima

facie case but also the evidence the Plaintiff offers to attack [Defendant's] proffered explanation for its action and the other evidence of retaliation." *Id.*; *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that, in this context, "the prima facie case is a largely unnecessary sideshow").

With this legal framework in mind, the court moves to the task of applying it to the alleged retaliatory acts in this case. Because the court already has determined that no reasonable jury could find that Defendant revoked Plaintiff's reasonable accommodations, *see supra* p. 22, Plaintiff has failed to establish a prima facie case of retaliation as to that particular claim. The court considers the remaining three alleged retaliatory acts in turn and finds that one of them survives summary judgment.

a.   Plaintiff's lowered performance rating

The court turns first to Plaintiff's claim that Defendant retaliated against her by downgrading her performance evaluation in 2017 after she filed an EEO complaint. *See* Am. Compl. ¶¶ 89–93. In response, Defendant contends that the evaluation rating that Plaintiff received was "based on Plaintiff's performance" and not "based on her disability, her request for accommodations, or the fact that she was being accommodated." Def.'s Opp'n at 31. Defendant offers the declaration of Plaintiff's supervisor, Mr. Burbach, who explains the reasons for giving Plaintiff the rating that he did. He first provides background on the evaluation system in place at the time, explaining that "[e]mployees received a rating ranging from 1 to 5" based on the following criteria:

> 1 being fully successful excellence (75% or more performance objectives being met or exceeded); 2 being fully successful excellence (26-74% objectives being met); 3 successful; 4 needs improvement; and 5 that employee required significant improvement because one or more objective[s] were not being met.

Burbach Decl. ¶ 6.

Although Plaintiff "met or exceeded her performance standards" in her previous performance evaluations, Mr. Burbach says "[he] began to notice a change in [her] performance in 2017." *Id.* ¶ 8. "During this time," he says, "[the Corps] and DOL had an increase in work to meet mission standards in response to emergency relief work after Hurricane Maria." *Id.* ¶ 9. As a result, "[m]any employees . . . took on additional tasks outside their normal scope of work and volunteered for emergency details in Puerto Rico and other affected states." *Id.* ¶ 10. "Despite the increase in emergency details and work," Mr. Burbach says, "[P]laintiff did not take on or offer to take on additional tasks and/or duties within the confines of her accommodations." *Id.* ¶ 11. "Therefore," according to Mr. Burbach, "[h]e determined that while [Plaintiff] met the vast majority of her performance objectives, she did not go above and beyond her objectives like her peers in the Directorate." *Id.* ¶ 12. Other factors that Mr. Burbach says contributed to the lowered rating included Plaintiff's "unwillingness to engage with her teammates" and to participate in various scheduled and impromptu meetings. *Id.* ¶¶ 13–15.

Because Defendant has offered a legitimate, non-retaliatory reason for his action, the only question the court need resolve is whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-[retaliatory] reason was not the actual reason and that [Defendant] intentionally [retaliated] against [Plaintiff] on the basis of" her protected activity. *Brady*, 520 F.3d at 494. Although a close call, the court finds that she has, for several reasons.

*First*, a reasonable juror could perceive enough disparity between Mr. Burbach's description of Plaintiff's performance and the objective rating criteria to cast doubt on the reasons given. The criteria states that a rating of "1" is warranted where an employee meets or exceeds

"75% of their objectives."  Burbach Decl. ¶ 6.  Both Plaintiff's and Mr. Burbach's deposition testimony reflect that Plaintiff met at least the "vast majority of her performance objectives," for the time period at issue, Burbach Decl. ¶ 12, and that her written work product did not diminish relative to years prior when she received the highest rating, *see* Burbach Dep. Tr. at 49:16–18; Pl.'s Dep. Tr. at 36:19–37:07.  Specifically, Mr. Burbach testified that as of January 2017 (three months into the rating period), he could not recall that anything had changed with Plaintiff's work performance, *see* Burbach Dep. Tr. at 54:20–22, and through the remainder of the rating period, he could not recall what specifically had changed with respect to Plaintiff's engagement with staff and production of work product, *id.* 68:14–22.  Mr. Burbach's primary complaints about Plaintiff's work performance relate almost entirely to her inability to be physically present in the office— something her disability prevents.  *See id.* at 48:19–49:8, 63:15–64:14, 66:22–67:7, 70:5–71:11.

Although Mr. Burbach notes that for the 2017 evaluation period there were increased responsibilities associated with Hurricane Maria for which some employees took on additional responsibilities and volunteered to travel, *see id.* at 67:15–20, 69:1–70:8; Burbach Decl. ¶¶ 9–10, the testimony reflects that the work associated with that emergency would not have fallen within Plaintiff's area of responsibility as a non-logistician, *see* Pl.'s Dep. Tr. at 62:3–12; Burbach Decl. ¶ 10, and Plaintiff of course was unable to travel to Puerto Rico given her ongoing medical treatment.  Nevertheless, Mr. Burbach cites the emergency relief work as indication that Plaintiff did not "go above and beyond her objectives like her peers."  Burbach Decl. ¶ 12.  Going above and beyond would seem to indicate accomplishing over 100% of an employee's objectives, but according to the objective criteria, an employee is eligible for the highest rating upon completion of 75% of her objectives.  *See id.* ¶ 6.

Any doubt created by the perceptible disparity between the reasons offered for Plaintiff's rating and the objective criteria is compounded by the fact that Mr. Burbach originally lowered Plaintiff's rating by two points, giving her a "3." *See* Burbach Dep. Tr. at 77:11–78:2. The fact that Mr. Burbach ultimately raised Plaintiff's rating from a "3" to a "2" after discussion with Plaintiff could cut either way in terms of his motivation, making it a question best suited for a jury.

*Second*, the context and timing of Plaintiff's degraded performance evaluation casts further doubt on the reasons given. The record shows that for at least three consecutive years, including the first year Plaintiff was on accommodations following her diagnosis, Plaintiff received the highest rating that could be achieved. PEX 14 at 311; Burbach Decl. ¶ 8. It was not until the first evaluation following Plaintiff's EEO complaints, *see* PEX 14 at 313 (showing that Plaintiff filed formal and informal EEO complaints in November and December 2016), and just under two months after Plaintiff told Mr. Burbach that her accommodations were "now a legal matter," DEX 13 at 36, that she received a lower rating, *see* Pl.'s Dep. Tr. at 35:13–19; *see also* Pl.'s SoF ¶ 57 ("On December 14, 2017, Burbach downgraded [Plaintiff's] performance [rating]."); Burbach Dep. Tr. at 77:11–19 (discussing December 15, 2017 email from Plaintiff to Mr. Burbach regarding her lowered performance rating). To be sure, "just because [an] employee was a good performer at an earlier time" does not mean that an employer's description of their performance as unsatisfactory at a later time is pretext. *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 163 (D.D.C. 2011). Nor is temporal proximity alone enough to prove pretext. *See Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). Nevertheless, the fact remains that the lower 2017 evaluation coincides with Plaintiff's filing of her complaints. A reasonable jury could consider this temporal proximity, along with other evidence, as demonstrating a retaliatory motive for lowering her rating.

*Third* and finally, all of the above took place against a backdrop of what a reasonable jury could perceive as increasing hostility directed at Plaintiff by Mr. Burbach, enough so that Plaintiff filed several complaints with the EEO office.  According to Plaintiff, Mr. Burbach's demeanor toward her began to change around April 2016, *see* Pl.'s Dep. Tr. at 107:8–15, and the record reflects that the tension between the two escalated throughout the rating period, eventually reaching a flash point with Mr. Burbach's letter in October 2017, *see* Pl.'s Dep. Tr. at 107:10–20; DEX 5 at 14.  Despite repeat explanations from Plaintiff's doctors that her cancer was stage IV and incurable, Mr. Burbach persisted with increasingly insensitive, if not aggressive, requests for Plaintiff to provide updates on her medical condition and her forecasted return to the office.  *See, e.g.*, DEX Nos. 2–13 at 6–36; *see also* Pl.'s Dep. Tr. at 107:10–20 ("His calls became progressively more aggressive in tone and he continuously asked for a specific date of when [Plaintiff] would return.").  Although periodic check-ins are surely an appropriate component of evaluating the continued need for accommodation, a reasonable jury could construe Mr. Burbach's communications with Plaintiff as increasingly insensitive and hard edged, such that his claim of Plaintiff's reduced performance could be viewed as a pretext for retaliation.

In sum, the court reiterates that this is a close case, and it is sensitive to the fact that a court may not serve as a "super-personnel department that reexamines an entity's business decisions." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982) (explaining that a district court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive").  The question at this juncture is whether it would be unreasonable for a jury to reject Mr. Burbach's explanation for Plaintiff's lowered performance rating and infer discrimination based on the record as a whole.  It would not be.  Accordingly, the court denies Plaintiff's and

Defendant's motions for summary judgment on this aspect of Plaintiff's retaliation claim, which must proceed to a jury.

          b.    <u>Disclosure of Plaintiff's medical information</u>

Plaintiff next contends that Defendant retaliated against her by the unauthorized disclosure of her personal medical information. *See* Am. Compl. ¶¶ 40–42, 102. Here, Defendant denies the allegation altogether, arguing that Plaintiff has failed to establish a prima facie case of retaliation. *See* Def.'s Opp'n at 25–30. The court agrees.

Plaintiff first learned of her cancer diagnosis on November 6, 2015, Pl.'s Dep. Tr. at 50:17–20, after which she notified Ms. Taswell, *id.* at 72:15–16, though she does not specify the date of that notification. She further asserts that she first engaged in protected activity on November 13, 2015, when she reached out to Mr. Newton to initiate her request for reasonable accommodation. *See* Pl.'s SoF ¶ 19; Pl.'s Reply at 8 (identifying the date of her "protected activity" as November 13, 2015, the day she "initiated her request for accommodations"). On that very same day, Plaintiff claims, she spoke to Ms. Taswell, who told Plaintiff that she had shared the news of her cancer diagnosis with another employee, Marti Sedgwick. *See* Pl.'s Dep. Tr. at 75:10–17. This timeline is critical to Plaintiff's prima facie case. Plaintiff must show not only that she was "engaged in statutorily protected activity" at the time of the disclosure but also that Ms. Taswell was aware that Plaintiff had engaged in that protected activity and that it was the but-for cause of her disclosure of Plaintiff's medical information. *See Solomon*, 763 F.3d at 14.

Both parties agree that the protected activity at issue began with Plaintiff's call to Mr. Newton on November 13, 2015. *See* Def.'s Resp. to Pl.'s SoF ¶ 19; Pl.'s Reply at 8. Plaintiff claims that a "reasonable juror could conclude that Taswell ha[d] spoken to [the other employee] that very same day." Pl.'s Reply at 8. But jurors are not permitted to speculate, and Plaintiff has

offered no evidence establishing that, on November 13, 2015, Ms. Taswell *both* spoke to Mr. Newton about Plaintiff's request for accommodation (thus learning about her protected activity) *and* disclosed Plaintiff's cancer diagnosis to Ms. Sedgwick *before* she spoke to Plaintiff.  In fact, Ms. Taswell testified that she became aware that Plaintiff had reached out to Mr. Newton only after Mr. Newton reached out to Mr. Burbach about Plaintiff at a later date.  *See* Def.'s Opp'n, Dep. of Belinda Taswell, ECF No. 38-5, at 97:12–19.  Plaintiff therefore offers no more than speculation that her protected activity preceded, and was the cause of, the unconsented disclosure of her medical condition.  The court enters summary judgment in favor of Defendant on this aspect of her retaliation claim.

c.    <u>Refusal to Credit Leave</u>

Finally, Plaintiff claims that Defendant retaliated against her by denying her reimbursement for leave she did not take when the federal government was closed for a blizzard in 2016.  *See* Am. Compl. ¶¶ 94–100.  Plaintiff asserts that, as a full-time teleworker, she was required to, and did, work a full 44-hour week despite the government shut down.  *See* Pl.'s Dep. Tr. at 155:22–156:19.  When she discovered that she had "mistakenly" been charged leave, *id.* at 156:25, she says she requested that it be fixed, and Mr. Burbach and Ms. Taswell ultimately refused to refund her the leave time, *id.* at 158:20–23.

In response, Defendant provides a legitimate, non-discriminatory reason for not reimbursing Plaintiff for the leave time at issue:  an independent audit was conducted, which determined that Plaintiff was on leave during the time in question.  *See* Def.'s Opp'n at 32–33 (citing Pl.'s Dep. Tr. at 157).  Plaintiff does not dispute that an audit was conducted.  Pl.'s Dep. Tr. at 157:11–22.  Instead, she disagrees with Defendant's characterization of the findings of that audit, asserting that the audit concluded she was "put on leave," not that she "took leave."  Pl.'s

Opp'n at 44 (citing Pl.'s Dep. Tr. at 157:15–17).   Either way, Plaintiff has failed to produce "sufficient evidence for a reasonable jury to find that" Defendant "intentionally [retaliated] against [her] on the basis of" her protected activity.  *Brady*, 520 F.3d at 494.  Plaintiff testified that she did not know who put her on leave.  Pl.'s Dep. Tr. at 157:16–22.  And she has not otherwise shown that Mr. Burbach and Ms. Taswell were doing anything other than adhering to agency policy by implementing the results of the audit and not reimbursing Plaintiff leave time.  Thus, the court finds Defendant is entitled to summary judgment on Plaintiff's claim that Defendant retaliated against her by not reimbursing Plaintiff 44 hours of leave time.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment and Sanctions for Spoliation of Evidence, ECF No. 33, is denied, and Defendant's Motion for Summary Judgment, ECF No. 34, is denied in part and granted in part.

The parties shall appear for a telephonic status conference to discuss a schedule for further proceedings on January 20, 2021, at 10:45 a.m.

Dated:  January 5, 2021

Amit P. Mehta
United States District Court Judge

31